FILED
2016 Mar-29 PM 03:55
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
MIDDLE DIVISION

| | |
|---|---|
| DR. LORETTA S. ROBINSON, | ) |
| | ) |
|    Plaintiff, | ) |
| | ) |
| v. | ) Case No.: 4:14-CV-1538-VEH |
| | ) |
| GADSDEN STATE COMMUNITY COLLEGE, | ) |
| | ) |
|    Defendant. | ) |

### MEMORANDUM OPINION

This civil action was filed on August 6, 2014, by the plaintiff, Dr. Loretta S. Robinson, against the defendant, Gadsden State Community College ("GSCC"). (Doc. 1). The complaint alleges that the defendant discriminated and retaliated against the plaintiff in violation of the Americans with Disabilities Act, 42 U.S.C. § 12201, *et seq.* (the "ADA") (Counts One and Two). The complaint also alleges a violation of the Alabama Discrimination Statute, Ala. Code § 21-7-8 (Count Three). All counts arise out of the plaintiff's employment with the defendant.

This case now comes before the court on the motion for summary judgment filed by the defendant. (Doc. 14). For the reasons stated herein, the motion will be **GRANTED**, and this case will be **DISMISSED with prejudice**.

## I. STANDARD

Under Federal Rule of Civil Procedure 56, summary judgment is proper if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) ("[S]ummary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.") (internal quotation marks and citation omitted). The party requesting summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings that it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. Once the moving party has met its burden, Rule 56(e) requires the non-moving party to go beyond the pleadings in answering the movant. *Id*. at 324. By its own affidavits – or by the depositions, answers to interrogatories, and admissions on file – it must designate specific facts showing that there is a genuine issue for trial. *Id*.

The underlying substantive law identifies which facts are material and which are irrelevant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *Chapman*, 229 F.3d at 1023. Only disputes over facts that might affect the

outcome of the suit under the governing law will properly preclude the entry of summary judgment. *Anderson*, 477 U.S. at 248. A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* If the evidence presented by the non-movant to rebut the moving party's evidence is merely colorable, or is not significantly probative, summary judgment may still be granted. *Id.* at 249.

How the movant may satisfy its initial evidentiary burden depends on whether that party bears the burden of proof on the given legal issues at trial. *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). If the movant bears the burden of proof on the given issue or issues at trial, then it can only meet its burden on summary judgment by presenting *affirmative* evidence showing the absence of a genuine issue of material fact – that is, facts that would entitle it to a directed verdict if not controverted at trial. *Id.* (citation omitted). Once the moving party makes such an affirmative showing, the burden shifts to the non-moving party to produce "significant, probative *evidence* demonstrating the existence of a triable issue of fact." *Id.* (citation omitted) (emphasis added).

For issues on which the movant does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways. *Id.* at 1115-16. First, the movant may simply show that there is an absence of evidence to support the non-movant's case on the particular issue at hand. *Id.* at 1116. In such an instance, the

non-movant must rebut by either (1) showing that the record in fact contains supporting evidence sufficient to withstand a directed verdict motion, or (2) proffering evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency. *Id.* at 1116-17. When responding, the non-movant may no longer rest on mere allegations; instead, it must set forth evidence of specific facts. *Lewis v. Casey*, 518 U.S. 343, 358 (1996). The second method a movant in this position may use to discharge its burden is to provide affirmative *evidence* demonstrating that the non-moving party will be unable to prove its case at trial. *Fitzpatrick*, 2 F.3d at 1116. When this occurs, the non-movant must rebut by offering *evidence* sufficient to withstand a directed verdict at trial on the material fact sought to be negated. *Id.*

## II.  FACTS

This court's summary judgment scheduling order provides:

> The first section [of the brief of the party opposing summary judgment] must consist of only the non-moving party's disputes, if any, with the moving party's claimed undisputed facts. The non-moving party's response to the moving party's claimed undisputed facts shall be in *separately numbered* paragraphs that coincide with those of the moving party's claimed undisputed facts. Any statements of fact that are disputed by the non-moving party must be followed by a specific reference to those portions of the evidentiary record upon which the dispute is based. *All material facts set forth in the statement required of the moving party will be deemed to be admitted for summary judgment purposes unless controverted by the response of the party opposing summary judgment.*

(Doc. 3 at 17) (emphasis in original). The plaintiff has not filed any opposition to the

motion for summary judgment. Accordingly, the following facts, set out in the movant's brief, are deemed to be admitted:

1. Dr. Loretta Sue Robinson ("Dr. Robinson") was hired by Gadsden State Community College ("GSCC") in September 1990 as a nursing instructor and continues to be employed by GSCC.

2. Dr. Robinson is able to perform the duties of her job as outlined in her job description. Dr. Robinson is presently 55 years of age.

3. Dr. Robinson's original campus/base assignment was at Helderman Hall on the Wallace Drive Campus in Gadsden, where she had enjoyed working without any problems since September 1990.

4. Dr. Robinson's last office at Helderman Hall was tiled and climate controlled by a wall unit which could not be regulated with the thermostat.

5. In 2011, Gadsden State Community College restructured its nursing faculty to better serve the students of Gadsden State Community College's nursing program.

6. On June 28, 2011, Dr. Robinson was advised by Dr. Raymond Staats that her campus/base assignment would be changed to the McClellan campus in Anniston without change in title, status or compensation.

7. Dr. Robinson made no complaint at that time with regard to the transfer.

8. Upon transferring to the McClellan campus, Dr. Robinson was initially assigned the temporary use of an office/storage room located in the classroom area for the EMS program as there was not a vacant office in the nursing faculty area.

9. On January 6, 2012, Dr. Robinson was asked to move into a recently vacated office in the nursing faculty area, so that the office/storage room could be used by the EMS program. In response, Dr. Robinson advised Kim Sonnberger, Coordinator of Nursing Education, and Dr. Susan Tucker,

Director of the College's Nursing Program, that she could not work in a carpeted office due to infections and allergies.

10. On January 9, 2012, Dr. Robinson advised Connie Meloun, Assistant Dean of Health Services, that she would be more than happy to relocate to an office without carpeting.

11. On January 11, 2012, Dr. Thomas, Dr. Robinson's primary care physician, advised that Dr. Robinson should not work or live in carpeted areas due to severe allergic rhinitis.

12. On January 17, 2012, Connie Meloun advised Dr. Robinson that an office next to Kim Sonnberger could be renovated by replacing carpet with tile.

13. Renovation of the vacant office was completed in July or early August of 2012.

14. Dr. Robinson alleges her disability began in late August 2012, arising out of her respiratory problems, asthma, hypoalbuminemia, low protein, serum protein, hypothyroidism, bronchitis, pneumonia, environmental allergies, and shortness of breath, anxiety and stress. Dr. Robinson was hospitalized from August 20, 2012 through August 22, 2012 with pneumonia, but returned to work per Dr. Thomas' medical directives on August 27, 2012.

15. Dr. Robinson had not visited the new office until after her August 20, 2012 hospitalization. Dr. Thomas excused Dr. Robinson from work from August 20, 2012 to August 27, 2012, and from clinicals from August 20, 2012 to September 1, 2012. Dr. Robinson expressed concerns to Dr. Thomas regarding the perceived hazards in the new office following which Dr. Thomas advised by note of August 22, 2012 that due to environmental concerns Dr. Robinson should remain in her current office.

16. On September 7, 2012, Dr. Jim Jolly, Dean of Instruction, issued a memo to Dr. Robinson advising that the EMS storage room was no longer available and asking Dr. Robinson to move into the renovated office assigned to her by close of business on September 11, 2012.

17. On September 11, 2012, Dr. Robinson moved to the renovated office although fearful and anxious of getting sick. After less than one hour of occupation in the renovated office, Dr. Robinson claims to have begun experiencing symptoms of shortness of breath, pounding heart, nausea and a feeling of doom.

18. Dr. Robinson was taken to Dr. Thomas'[s] office by a co-employee. Dr. Thomas took Dr. Robinson off work until September 25, 2012.

19. On September 13, 2012, Kim Cobb, Director of Human Resources, provided Dr. Robinson with a copy of the College's policy and forms for workplace accommodation requests.

20. On September 18, 2012, Dr. Robinson returned the forms for workplace accommodation requests to the College's Human Resources office, but did not provide medical documentation of a disability.

21. Prior to Dr. Robinson's return to work, Dr. Staats, through Kim Cobb, requested to know what specific allergens affected Dr. Robinson, so that a safe work environment could be provided to Dr. Robinson.

22. Dr. Robinson was allowed to continue using the EMS storage room/office until an evaluation of her requested accommodation could be completed.

23. In response to Dr. Staats'[s] request for additional information, Dr. Thomas completed a physician's statement on September 24, 2012 and prepared a memo dated September 27, 2012. In these notes, Dr. Thomas advised that Dr. Robinson had been diagnosed with asthma, drug and environmental allergens, hypothyroidism, low serum albumin and work-related stress. Dr. Thomas further advised that the use of steroids affected Dr. Robinson's immunocompetency. Specific examples of allergens given were sulfa, adhesives and old carpet. Dr. Thomas did not specify any disability nor address any work place accommodations.

24. ERG Environmental conducted air quality testing on September 24, 2012[,] and submitted a report dated September 27, 2012, which indicated that both the EMS office/storage room and the renovated office were in the

"Clean Building" range.

25.     In the late fall of 2012, Dr. Robinson began wearing a mask at her own discretion.

26.     On November 26, 2012, Kim Cobb advised Dr. Thomas of the results of the air quality testing and asked that Dr. Thomas advise whether Dr. Robinson could move into the office renovated in August 2012, with an air purifier that had been provided for Dr. Robinson's use.

27.     On December 3, 2012, Dr. Robinson was offered the option to relocate to Helderman Hall, where she had previously been assigned from 1990 until 2011, but Dr. Robinson declined.

28.     On December 4, 2012, Kim Cobb requested that Dr. Robinson consult with Dr. Thomas regarding moving into the renovated office or to relocate back to Helderman Hall.

29.     December 7, 2012, Dr. Thomas advised that Dr. Robinson should avoid exposure to allergens in old carpet, old buildings, linoleum, chemical cleaners, floor wax, adhesives and mold. Further, that Dr. Robinson would benefit from an office free of chemical cleaners and wax floors, as well as the use of an air purifier. Again, Dr. Thomas did not address any medical condition or disability and advised that Dr. Robinson had been referred to Dr. Grubbe and Dr. Patel for further testing.

30.     Dr. Robinson moved into the renovated office on December 10, 2012. An air purifier had been installed in the renovated office. Dr. Robinson continues to work from her renovated office.

31.     On December 12, 2012, Dr. Robinson was seen by Dr. Grubbe, allergy specialist, and executed an authorization for the air quality test results to be released to Dr. Grubbe. The authorization was faxed to Kim Cobb at GSCC on January 14, 2013. and results were provided to Dr. Grubbe on January 15, 2013.

32.     Dr. Robinson was again treated by Dr. Grubbe in March, 2013, at which time Dr. Grubbe did not make any recommendations with regard to

the air quality test results, nor did he place any physical restrictions on Dr. Robinson.

33. Since November 25, 2012, Dr. Robinson has occasionally had to use her rescue inhaler, but has not suffered an asthma attack requiring medical care.

34. On November 30, 2012, Dr. Robinson filed her initial Charge of Discrimination with the EEOC alleging harassment and denial of ADA accommodations.

35. In the fall of 2013, Dr. Robinson requested that Student X be removed from her clinical rotation which would require Student X be placed in clinicals that would require her to drive a considerable distance from her home. The decision was made to allow X to remain in Dr. Robinson's clinicals. X was given a positive evaluation by Dr. Robinson.

36. On January 23, 2014, Dr. Robinson filed a second Charge of Discrimination alleging retaliation.

37. Since filing her EEOC charges, Dr. Robinson has not experienced any adverse employment action and has been awarded summer contracts for 2013 and 2014 which earned Dr. Robinson an additional twenty plus thousand dollars each summer.

38. When not teaching, Dr. Robinson works PRN at Stringfellow Hospital. Dr. Robinson is able to take care of her daily living activities, such as shopping, cooking, and cleaning. She also likes to bird watch, garden, scrapbook and assist older people with things like mopping floors, washing dishes, taking care of pets.

(Doc. 24 at 7-15) (citations to the record omitted).

## III.  ANALYSIS

### A.  Eleventh Amendment Immunity

GSCC correctly asserts that Eleventh Amendment immunity is applicable to the

ADA claims against it. The Eleventh Amendment provides that

> [t]he judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by citizens of another State, or by citizens or subjects of any foreign state.

U.S. Const. amend. XI. "It is firmly established that the Eleventh Amendment immunizes unconsenting states from private suits in federal courts for retrospective money damages, whether brought by their own citizens or by citizens of other states." *Ostroff*, 554 F. Supp. at 355 (citing *Hans v. Louisiana*, 134 U.S. 1, 1 (1890); *Edelman v. Jordan*, 415 U.S. 651, 662–63 (1974)). The United States Supreme Court has specifically held that suits by "employees of the State of Alabama [to] recover money damages by reason of the State's failure to comply with the provisions of [the ADA] . . . are barred by the Eleventh Amendment." *Bd. of Trustees of Univ. of Alabama v. Garrett*, 531 U.S. 356, 360, 121 S. Ct. 955, 960, 148 L. Ed. 2d 866 (2001). The question then becomes whether GSCC is "the State of Alabama" for purposes of the Eleventh Amendment.

In *Morris v. Wallace Cmty. Coll.-Selma*, 125 F. Supp. 2d 1315, 1335-36 (S.D. Ala. 2001) *aff'd sub nom. Morris v. Wallace Cmty.*, 34 F. App'x 388 (11th Cir. 2002), a very well reasoned and persuasive opinion, Judge Vollmer held that Eleventh Amendment immunity applies to Alabama community colleges. Judge Vollmer explained that Eleventh Amendment immunity "extends . . . to entities having a sufficiently close connection to the state that a suit against the entity is effectively one against the state

10

itself." *Morris*, 125 F. Supp. 2d at 1334 (citing *Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 100, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984)). He continued:

> Whether an entity other than the state itself partakes of the state's Eleventh Amendment immunity depends on whether it is an "arm of the state." *Mt. Healthy City School District Board of Education v. Doyle,* 429 U.S. 274, 280, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). "Whether [the College] is an arm of the state protected by the Eleventh Amendment 'turns on its function and character as determined by state law.' ... Factors that bear on this determination include the definition of 'state' and 'political subdivision,' the state's degree of control over the entity, and the fiscal autonomy of the entity." *Fouche v. Jekyll Island—State Park Authority,* 713 F.2d 1518, 1520 (11th Cir.1983)(quoting *Sessions v. Rusk State Hospital,* 648 F.2d 1066, 1069 (5th Cir.1981)). A fourth factor, sometimes subsumed within the "fiscal autonomy" factor, is "who is responsible for judgments against the entity." *Tuveson v. Florida Governor's Council on Indian Affairs, Inc.,* 734 F.2d 730, 732 (11th Cir.1984). These factors were most recently applied by the Eleventh Circuit in *Miccosukee Tribe v. Florida State Athletic Commission,* 226 F.3d 1226, 1231–34 (11th Cir.2000).
>
> Although the defendants have not applied this factor analysis, the Court is satisfied that the College is entitled to Eleventh Amendment immunity. *Powers v. CSX Transportation, Inc.,* 105 F.Supp.2d 1295, 1299–1301 (S.D.Ala.2000) (applying the factor analysis to the Alabama Department of Transportation). First, Alabama's state law sovereign immunity extends to community colleges such as the College. Second, the life of the College is heavily regulated by the State Board of Education, itself presumptively an arm of the state possessing Eleventh Amendment immunity. Ala.Code § 16–60–110. Third, the College is further regulated by the Chancellor of the Postsecondary Education Department. *Id.* § 16–60–111.5. Fourth, the College depends heavily on the state for funding, *id.* §§ 16–60–111.4(4), (6), –111.5(6), has limited ability to borrow money, *id.* § 16–60–113, and apparently may not issue bonds. *See id.* § 16–60–90 (establishing a separate authority to issue bonds for construction and equipment). Fifth, the plaintiff has made no showing that any monetary relief awarded against the College would not come from the

11

state treasury.

*Id.* at 1335-1336 (footnotes omitted); *see also*, *LaFleur v. Wallace State Cmty. Coll.*, 955 F. Supp. 1406, 1421-22 (M.D. Ala. 1996) (holding that community college is entitled to Eleventh Amendment immunity because the Supreme Court of Alabama has held that institutions of higher learning, including the state's community colleges, are arms of the state.). The court agrees with the analysis and the reasoning used by Judge Vollmer in the *Morris* case, and adopts it. GSCC is entitled to Eleventh Amendment immunity from suit under the ADA. Summary judgment on the ADA claims (Count One and Two) will be granted.[1]

## B. <u>Alabama Immunity</u>

As to the plaintiff's state law claim, GSCC also correctly argues that it is entitled to governmental immunity under the Alabama Constitution. Article I, § 14 of the Alabama Constitution provides generally that the State of Alabama is immune from suit: "[T]he

---

[1] An exception to Eleventh Amendment immunity exists concerning prospective relief to enjoin continuing violations of the federal constitution. The exception also extends to monetary relief, including costs, that is ancillary to such prospective injunctive relief. *Kentucky v. Graham*, 473 U.S. 159, 169 n.18 (1985). As explained by the Eleventh Circuit, the exception "is derived from *Ex Parte Young*, 209 U.S. 123, 28 S. Ct. 441, 52 L. Ed. 714 (1908), which held that <u>official capacity suits for prospective relief to enjoin state officials from enforcing unconstitutional acts are not deemed to be suits against the state</u> and thus are not barred by the Eleventh Amendment." *Scott v. Taylor,* 405 F.3d 1251, 1255 (11th Cir. 2005) (emphasis supplied). "In such cases, it is <u>the individual and not the state</u> which is being sued, and when a <u>state official</u> acts unconstitutionally, he is stripped of his official or representative character and Eleventh Amendment protection." *Williams v. Ala. State Univ.*, 865 F. Supp. 789, 792 (M.D. Ala. 1994) (emphasis added) (citing *Ex parte Young*, 209 U.S. at 159–60), *rev'd on other grounds*, 102 F.3d 1179 (11th Cir. 1997). The court notes that the plaintiff has <u>only</u> sued GSCC, and has not named any individual defendant(s).

State of Alabama shall never be made a defendant in any court of law or equity." This constitutional provision "has been described as a 'nearly impregnable' and 'almost invincible' 'wall' that provides the State an unwaivable, absolute immunity from suit in any court." *Ex parte Town of Lowndesboro*, 950 So. 2d 1203, 1206 (Ala. 2006). Section 14 "specifically prohibits the State from being made a party defendant in any suit at law or in equity." *Hutchinson v. Board of Trustees of Univ. of Alabama*, 256 So. 2d 281, 283 (Ala. 1971). Additionally, under § 14, state agencies are "absolutely immune from suit." *Lyons v. River Road Constr., Inc.*, 858 So. 2d 257, 261 (Ala. 2003).

> "[T]his immunity extends to the state's institutions of higher learning." *Taylor v. Troy State University,* 437 So.2d 472, 474 (Ala.1983). In particular, the state's sovereign immunity reaches community colleges . . . . *Ex parte Craft,* 727 So.2d 55, 58 (Ala.1999); *Williams v. John C. Calhoun Community College,* 646 So.2d 1, 2 (Ala.1994); *Shoals Community College v. Colagross,* 674 So.2d 1311, 1313–14 (Ala.Civ.App.1995), *cert. denied,* 674 So.2d 1315 (Ala.1996). All that need be shown is that the defendant "was a post-secondary educational institution operating under the authority and supervision of the State Board of Education." *Id.* at 1314.

*Morris*, 125 F. Supp. 2d at 1344. Governmental immunity bars the state law claim against GSCC. Summary judgment will be granted as to Count Three.

  C. <u>**The Merits of the ADA Claims**</u>

Even if the ADA claims were not barred, they would fail on their merits. The Eleventh Circuit has recently noted:

> We analyze ADA discrimination claims under the *McDonnell*

> *Douglas* burden-shifting analysis applied to Title VII employment discrimination claims. *Earl v. Mervyns, Inc.*, 207 F.3d 1361, 1365 (11th Cir.2000). Under that framework, a plaintiff-employee first establishes a prima facie case of discrimination. *See Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1087 (11th Cir.2004). To establish a prima facie case of ADA discrimination, a plaintiff must show (1) a disability, (2) that she was otherwise qualified to perform the job, and (3) that she was discriminated against based upon the disability. *Cleveland v. Home Shopping Network, Inc.*, 369 F.3d 1189, 1193 (11th Cir.2004). The burden then shifts to the defendant to articulate a legitimate reason for its employment action. *Wilson*, 376 F.3d at 1087. If it can, the burden shifts back to the plaintiff to offer evidence that the reason is pretextual. *Id.* If the plaintiff fails to show pretext, we affirm the grant of summary judgment on that ground. *EEOC v. Total Sys. Servs.*, 221 F.3d 1171, 1177 (11th Cir.2000). Where the defendant has met its burden of articulating a legitimate, non-discriminatory reason for its action, we may assume without deciding that the plaintiff has established a prima facie case and decide the case on the question of pretext. *See, e.g., Holifield v. Reno*, 115 F.3d 1555, 1564 (1997); *Wascura v. City of S. Miami*, 257 F.3d 1238, 1243 (11th Cir.2001).

*Thomas v. Dolgencorp, LLC*, No. 15-13399, 2016 WL 1008622, at *1 (11th Cir. Mar. 15, 2016).

The same burden-shifting framework applies to ADA retaliation claims. *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1287 (11th Cir. 1997). To establish a prima facie case of retaliation, the plaintiff must allege that "'(1) [s]he engaged in a statutorily protected expression; (2) [s]he suffered an adverse employment action; and (3) there was a causal link between the adverse action and h[er] protected expression.'" *Smith v. Miami-Dade Cty.*, 621 F. App'x 955, 960 (11th Cir. 2015) (quoting *Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1260 (11th Cir.2001)).

14

Because the defendant's undisputed facts "articulate a legitimate reason for its employment action[,] . . . the burden [has shifted] back to the plaintiff to offer evidence that the reason is pretextual." *Thomas*, 2016 WL 1008622, at *1. However, the plaintiff has not responded to the motion for summary judgment. She has therefore failed to carry her burden. Summary Judgment is appropriate as to Counts One and Two for this alternative reason as well.

## IV.   CONCLUSION

For the reasons stated above, Summary Judgment will be **GRANTED** to the defendant and this case will be **DISMISSED with prejudice**. A final order will be entered.

**DONE** this 29th day of March, 2016.

_____
**VIRGINIA EMERSON HOPKINS**
United States District Judge